# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH GIBSON, III | : | CIVIL NO. 3:06CV1265(JCH) |
| v. | : | |
| JAMES WOOD | : | NOVEMBER 5, 2007 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rules of Civil Procedure 56, the defendant in the above-captioned matter hereby move for summary judgment in his favor as to all claims as he is entitled to qualified immunity and as the plaintiff does not have sufficient evidence to prove that the defendant violated the plaintiff's due process rights.

Plaintiff's claim first seems to be that, upon hearing that the plaintiff parolee considered his personal security to be at risk, his parole officer should have excused the plaintiff from his reporting requirements, or met the plaintiff outside of his parole office, and that, because he did not, and because the plaintiff was allegedly assaulted by third parties on the street outside the parole office en route to reporting to his parole officer, the defendant parole officer is responsible for his injuries.

The more sinister claim, absent a shred of evidence, is that the defendant parole officer somehow conspired with unnamed members of a criminal gang to harm the plaintiff when the plaintiff reported to his parole officer. The complaint alleges, "Upon information and belief, the defendant was the only person other than the plaintiff himself who knew that the plaintiff had been instructed to report to the defendant's Meriden office on the evening of March 31, 2005." Comp. ¶ 15. The plaintiff further alleges, without a shred of supportive evidence:

Upon information and belief, the defendant *intentionally or recklessly* caused members of the Latin Kings gang to learn that the plaintiff would be available at his office to be killed on the evening of March 31, 2005, *knowing that as a result the plaintiff would likely be murdered.*

Comp. ¶ 18 (emphasis added).

The parole officer had no duty to excuse the plaintiff from his reporting requirements, nor did he have any duty to investigate or confirm that the plaintiff's alleged concerns about his safety, which was said to have consisted of general death threats having nothing to do with the Meriden parole office as well as general knowledge averred by the plaintiff that the parole office is "known" by unnamed persons "to be frequented by dangerous members of the aforesaid Latin Kings gang." Comp. ¶ 11. No such duty has been clearly established in the law. There is neither caselaw nor evidence supporting this claim, which plaintiff brings as a substantive due process claim alleging that the defendant's conduct "shocks the conscience".

I. <u>**Plaintiff's Allegations**</u>

A. **Complaint**

There is no dispute about some of plaintiff's allegations. It is undisputed that the plaintiff presently resides in North Carolina. Comp. ¶ 3. It is undisputed that the defendant is and at all relevant times has been a Connecticut parole officer acting under color of law. Comp. ¶¶ 4-5. Nor is it disputed that the plaintiff in this case was a plaintiff in a civil action, 3:02CV1592(WWE), a suit against two correctional officials for the State of Connecticut. Comp. ¶ 6. While the plaintiff's characterization of his failed previous lawsuit is not agreed to, it is not disputed that in that case, testimony was provided to a jury on March 21, 2005, by the plaintiff to the effect the plaintiff claimed to

have been an informant against the Latin Kings gang and claimed that as a result, he was assaulted by a Latin Kings "hit man" while in prison in 1999. Comp. ¶ 7.

It is also not disputed that there was publicity regarding plaintiff's claims in the previous, failed lawsuit. Comp. ¶ 8. The plaintiff claims to have received "death threats" from an undisclosed source after the March 21 or 22, 2005 publicity. Comp. ¶ 9. These threats are substantiated only by plaintiff, as there were no witnesses, however, even if the Court takes the plaintiff's claim that he received death threats as true for purposes of this motion, the plaintiff's claim fails. Comp. ¶ 10. The plaintiff alleges that he "reasonably believed" that these threats "emanated from the … Latin Kings gang." Comp. ¶ 9. Of course, plaintiff has nothing with which to substantiate this claim, but, again, even taking it as true for purposes of this motion, the plaintiff's claim against his parole officer fails as a matter of law. Comp. ¶ 9.

It is not disputed that at the time of the plaintiff's trial in the aforementioned matter, the plaintiff was on parole and assigned to parole officer James Wood, the defendant. Comp. ¶ 10. It is not disputed that the defendant's office was in Meriden, Connecticut. Comp. ¶ 11. The plaintiff can provide no evidence that the defendant Wood had any choice or even input about where the State of Connecticut chose to establish parole offices, so it is likely undisputed that the defendant Wood was assigned by his employer to meet with parolees at the Meriden office, and that he did not choose the site for the office or its placement in a certain neighborhood.

It is undisputed that the plaintiff contacted his parole officer and told him that he did not feel he could report as required due to alleged threat to his safety. Comp. ¶ 12. It not disputed that the plaintiff's Attorney, Joseph Merly, contacted Officer Wood to see if

he could have his client excused from reporting as required on March 31, 2005.   It is undisputed that the plaintiff was required by his parole officer, in accordance with the conditions of his parole, to report to his parole officer at the Meriden office at some point on March 31, 2005.  Comp. ¶ 13.  It is not disputed that the plaintiff claims to have been assaulted by three unidentified persons when he was in Meriden on the street on March 31, 2005.  Comp. ¶ 15.  Nor is it disputed that the plaintiff sustained a stab-type wound to his chest on the evening of March 31, 2005.  Comp. ¶ 15.  While the plaintiff has no evidence whatsoever other than his own conjecture and testimony, even if the Court takes as true the plaintiff's claim that he was stabbed by persons he assumes to be members of the Latin Kings gang, the plaintiff's claim fails as a matter of law.

### B.      Deposition

The plaintiff was first incarcerated from 1991 through December 15, 1999.  **Ex. A Plt. Deposition pp. 31-32.**  The plaintiff claims that during this period of incarceration, ending in 1999, he was essentially coerced by correctional officials to both join the Latin Kings gang and work as a confidential informant for those officials.  **Ex. A 36-38.** During the latter part of 1999 is when the plaintiff claims he was assaulted by "hit men" for the Latin Kings.  **Ex. A 42-48.**  From this time forward, the plaintiff asserts that the Latin Kings had a "hit out on [his] life."  **Ex. A 47.**

When the plaintiff was released from prison in 1999, he went to live with his father in Meriden, Connecticut, although he also lived with his grandmother in nearby Wallingford for some period of time after his release.  **Ex. A 48.**   The plaintiff testified "And then I went to Meriden.  And that's where I met Mr. Wood."  **Ex. A 49.**  The plaintiff was reincarcerated in October of 2001 and released in April of 2004.  **Ex. A 50,**

**66.** The plaintiff was reincarcerated after the incident that is the subject of this lawsuit in April of 2005. **Ex. A 50.** The plaintiff admits to being "on and off cocaine" during the time he was on parole as well as using "alcohol here and there". **Ex. A 52.**

The plaintiff had his parole transferred to the Meriden office. **Ex. A 66.** From approximately April of 2004 until April of 2005, the plaintiff's parole was supervised by Officer Wood. **Ex. A 66.** The plaintiff worked during that time for Crosby Moving and Trucking. **Ex. A 67.** He reported either weekly or bi-weekly to Officer Wood, and was subject to random urinalysis at this time. **Ex. A 67.**

The plaintiff claims to have told a previous parole Officer that he was uncomfortable reporting to parole in Meriden but that the officer took no action other than to let him know if he saw something specific or felt he had a problem. **Ex. A 55-56.** The plaintiff also claims that he told Officer Wood early on in the year of his supervision that he had concerns for his safety due to "the clientele of Meriden AIC they're obviously all ex-convicts." **Ex. A 74.** The plaintiff testifies that Officer Wood did not respond in the first instance but that a female staff member replied by saying "I don't think you have anything to worry about here at Meriden AIC. We have a good client base" or words to that effect. **Ex. A 74-75.** The plaintiff claims he shared his concerns again with the female staff member in December of 2004 but that Mr. Wood was not present at the time. **Ex. A 76.**

The plaintiff claims that weeks later he mentioned a specific name to Officer Wood, and Officer Wood looked up the other parolee's information and said "I wouldn't worry about him. I think he's discharging pretty soon." **Ex. A 78.** The plaintiff said he dropped the subject as he did not want to argue with his Parole Officer. **Ex. A 78.**

The plaintiff says that the next conversation he had with Officer Wood was after the mistrial was declared in his other lawsuit. **Ex. A 79.** The plaintiff concedes that he was supposed to report to the Meriden parole office on March 24, 2004, but failed to do so and failed to call his parole officer to tell him why. **Ex. A 81.** Plaintiff claims that Officer Wood called him the next day, Good Friday, in response to a call from the plaintiff. **Ex. A 83.** Plaintiff alleges that he explained to Mr. Wood his "legal problems" and:

> explained to him that I had been getting death threats. My lawsuits been going on. I don't feel safe going there to Meriden …Mr. Wood jumped in the middle, actually cut me off before I could finish and said, "I don't care about your little lawsuit, and your safety concerns about your little lawsuit. That's not my problem. I'm your parole officer. You're to report to me next Thursday or I'm going to lock you up."

**Ex. A 83.**

When asked if he was current with all of his parole obligations at the time of this conversation, the plaintiff testified that in that same conversation:

> Mr. Wood had also in that conversation …asked me why I did not report. …But that's when jury selection was going on. And I had spoken to Vanessa. She works hand in hand with Mr. Wood. And she was my case manager. And I told her that I was going to very tied up for the next three weeks because of this federal lawsuit. And she told me not to worry about it. And now I do remember Mr. Wood said, "She's not your parole officer, I am."

**Ex. A 109.**

The plaintiff testifies, and it is not disputed, that there was a window of time within which he could report, from 2pm to 7pm or 2pm to 8pm. **Ex. A 85, 110.**

The plaintiff was asked in his deposition whether it is his contention "that Mr. Wood somehow communicated to representatives of the Latin Kings gang that you were going to be coming" to report for parole. **Ex. A 95.** He responded, "Well, to be honest with you, it's not my contention. However, it's been suggested…." **Ex. A 95.** When

asked if he had anything to support this claim in the complaint, the plaintiff responded by saying that on one occasion the plaintiff told him that he knew of a Hispanic male who was selling cocaine and that Mr. Wood "neglected to actually even pursue" this alleged proffer of information. **Ex. A 98-99**. The plaintiff has no evidence whatsoever that the defendant Officer Wood had any criminal or sinister communication with members of the Latin Kings gang regarding the plaintiff or anything else.

The plaintiff testified that on the day in question, before reporting to the Meriden office to see his parole officer, he spoke with his attorney around 4pm. **Ex. A 116**. He claims that after the conversation with his attorney, he "stood there for a little while" and then he went and got something to eat. **Ex. A 116**. The plaintiff reports that he got something to eat at Taco Bell in Meriden a mile or two from the place he had to report. **Ex. A 116**. The plaintiff claims he went through the drive-through and then ate in the parking lot, testifying:

> Well, at that time I'm a little bit nervous too….I mean, I don't want to be wandering around Meriden in restaurants and places like Taco Bell. Who works at Taco Bell? A lot of Mexicans and Hispanics. McDonald's, Burger King, same thing. I'm trying to use common sense here. You know, wandering around Meriden in the streets of Connecticut while my picture's all over the TV. You know, so I decided to go through the drive-through.
> When I ate, I took my time. I might have been in the parking lot 25 minutes. You know, I'm eating. At that time I was smoking. So, I had a cigarette.

**Ex. A 120**.

The plaintiff further testified that he was then attacked by three men, one of whom plunged a knife into his chest. **Ex. A 120-129**. He was asked, "Were you able to discern the nationality of any of the three people that you say were there to attack you?

**Ex. A 130**.  Plaintiff responded:  "My assumption, I believe I told the Meriden detectives, they were Hispanics."  **Ex. A 130**.

The plaintiff complained that after the incident in which he claims he was assaulted, Mr. Wood was still his parole officer, and now switched plaintiff's reporting requirements to Waterbury.  **Ex. A 142**.  The plaintiff felt this was "even more dangerous."  **Ex. A 142.**  The plaintiff testified that he did not understand why Mr. Wood could not simply come to his house.  **Ex. A 142**.  Shortly after the incident, the plaintiff was arrested for trespassing in "a high drug area" in New Haven.  **Ex. A 142-43**.  He then testified, "And, of course, as soon as I got arrested, Mr. Wood was quick to violate my parole and send me back to jail."  **Ex. A 143**.

While the plaintiff claims in his complaint that members of the Latin Kings gang assaulted him, no person or persons have ever been arrested or charged with his assault.

**Ex. A 131**.  The plaintiff testified as follows:

> Q:      So, in your complaint when you say that representatives of the Latin Kings gang were waiting for you and they're the ones that assaulted you, you don't really know that it was representatives of the Latin Kings gang?
> A:      As a layman…I want to say, yeah, they were Latin Kings.  Do I have any proof?  No.  Just like I don't have any proof that I was set up.  I don't have any proof.

**Ex. A 144**.

The plaintiff also testified he has no proof that the defendant had anything to do with his assault, other than being "the only person" who knew the plaintiff was going to report to his parole officer on that evening, as well as his estimation that the Latin Kings have infiltrated the Department of Correction which means they could also infiltrate parole officers.  **Ex. A 145-46**.

## II.    Defendant's Summary Judgment Presentation

The defendant James Wood is currently employed by the State of Connecticut, having been so employed for approximately 20 years.  **Ex. H Wood Aff. ¶ 2.**  For eighteen of those years he has been a Parole Officer.  **Ex. H 2.**   He has been a Parole Officer in New Haven, Waterbury, Hartford , New Britain, Meriden, Bristol, Torrington, Danbury, New Milford, Southington, and Cheshire.  **Ex. H 2.**  Wood's duties as a Parole Officer have generally consisted of the supervision of both people designated for parole supervision by the Board of Pardons and Parole and, more recently, persons designated by the Department of Correction for Transitional Supervision.  **Ex. H 3.**

In 2005, Officer Wood was working out of the Waterbury district office, assigned to the Meriden district.  **Ex. H 4.**  He was responsible for the supervision of approximately 80 to 100 parolees at that time.  **Ex. H 4.**  Supervision generally consists of monitoring offenders' re-entry into the community.  This includes face-to-face meetings, or reportings by parolees, monitoring and facilitating treatment, conducting random urinalysis to detect the use of illegal substances by parolees, investigating parole plans provided by institutional parole officers, which includes background checks of potential sponsors, determining the appropriateness of a proposed residence, which includes visiting the residence, creating release plans, and monitoring reintegration.  **Ex. H 5.**  Officer Wood also investigates out-of-state packages on potential parolees pursuant to the Interstate Compact.  **Ex. H 5.**  This requires coordination with out-of-state agencies.

For a typical parolee, Officer Wood receives a parole package prepared by an institutional parole Officer and sent to a District Office, and assigned to the appropriate

parole Officer covering the anticipated residence area. **Ex. H 6.** As the Parole Officer, he would investigate the information provided, and determine whether to accept the parole plan. **Ex. H 6.** Officer Wood would then release the person to the residence after personally visiting the residence(s) proposed and would meet with the parolee and orient him as to the conditions of his parole supervision. **Ex. H 6.** The parolee would then be directed to various resource agencies including sex offender evaluation and treatment, substance abuse treatment, SAGA (state assisted medical benefits) for medical and mental health treatment, electronic monitoring with GPS, employment assistance and job development. **Ex. H 7.**

All of Officer Wood's duties require some level of record keeping, including case management notes, conditions of parole, and substance abuse treatment progress reports. **Ex. H 8.** He is also required to review paperwork generated by other agencies regarding any parolee and to take or recommend appropriate action. **Ex. H 8.** If a parolee commits a criminal violation, it is Officer Wood's duty to lodge a remanding order with the arresting agency. If a parolee commits a technical violation, it is his duty to remand the parolee to custody. In order to do this, Officer Wood has to personally locate and apprehend the parolee. When a parolee is taken back into custody, the parolee needs to be presented with a notice of parole violation within 72 hours, which indicates to them why Officer Wood felt there was probable cause to lodge the remand. This needs to state the specific conditions of parole that have been violated. Officer Wood is required to issue a violation report in a timely manner and present it to a supervisor for review and subsequently the report is submitted to the Board of Parole. Officer Wood also collects the appropriate paperwork to go with this. **Ex. H 9.**

Officer Wood also physically transport parolees upon release from prison to their residence and often to treatment agencies if they lack the family or other support system to enable them to do this.  **Ex. H 10.**  His duties have also consisted of testifying in Court or before the Board of Parole.  **Ex. H 11.**  If an inmate on Transitional Supervision on Officer Wood's caseload absconds, he is required to generate an arrest warrant for review by a Superior Court judge who will determine whether probable cause exists for an escape charge.  **Ex. H 12.**  Officer Wood's job also requires interaction with various law enforcement agencies, judicial personal, and administrators.  **Ex. H 13.**  He also makes himself accessible to family members of parolees, who are a good resource.  Officer Wood regularly meet with family members and enlists their assistance in the parolee's reintegration into society.  **Ex. H 13.**

A review of the defendant's Field Notes indicates that Officer Wood first met Mr. Gibson on April 29, 2004.   **Ex. H 14.**  The plaintiff showed up at the office in Meriden and stated that he had been under supervision in Wallingford under another Parole Officer and wanted to transfer his parole supervision to Meriden as he was living with his father in Meriden.  **Ex. H 14.**  This was not unusual for a parolee.  **Ex. H 15.**  To accommodate Mr. Gibson's request, his parole supervision was transferred from Wallingford to Meriden, and Officer Wood became the plaintiff's Parole Officer, accepting the case on May 6, 2004.  **Ex. H 15.**  The transfer of the plaintiff's supervision was confirmed later that month.  **Ex. H 15.**

Officer Wood needed to investigate the information regarding the residence in Meriden, which he did, prior to the plaintiff's parole supervision being transferred to him in Meriden.  **Ex. H 16.**  After Officer Wood accepted the case, the casenotes and the

parole file regarding the plaintiff were sent to him, and within a short time period Officer Wood reviewed the casenotes and met with the plaintiff when he reported to Officer Wood at the Meriden AIC office. **Ex. H 17.** It would also have been Officer Wood's practice to discuss the transfer of a parolee with the previous Parole Officer, who in this case was Parole Officer Nelson, within the weeks surrounding the transfer. **Exs. H 17; B Conditions of Parole 4/4/04.** The casenotes routinely include a form generated by the Board of Parole entitled "Conditions of Parole" which contains the conditions of parole as set forth by the Board. **Exs. H 17; B.**

As part of Officer Wood's review, he reviewed the Conditions Parole set by the Board of Parole at the time Mr. Gibson was paroled. **Exs. B; H 18.** These conditions include 13 standard conditions as well as additional conditions imposed by the Board. **Exs. H 18; B.** The first standard condition for any person paroled by the Board of Parole, as Mr. Gibson was, is as follows: "**RELEASE. DIRECTION.** UPON RELEASE, YOU WILL REPORT TO YOUR ASSIGNED PAROLE OFFICER AS DIRECTED AND FOLLOW THE PAROLE OFFICER'S INSTRUCTIONS. YOU WILL REPORT TO YOUR PAROLE OFFICER IN PERSON, BY TELEPHONE AND IN WRITING WHENEVER AND WHEREVER THE PAROLE OFFICER DIRECTS." **Exs. H 19; B.** The ninth standard condition for any person paroled by the Board of Parole is: "**DRUGS PROHIBITED.** YOU WILL NOT USE, OR HAVE IN YOUR POSSESSION OR CONTROL, ANY ILLEGAL DRUG, NARCOTIC OR DRUG PARAPHERNALIA." **Exs. H 19; B.**

A review of Mr. Gibson's file indicates he was incarcerated in April of 2003, when the full panel of the Board of Parole paroled him. **Ex. H 20.** Mr. Gibson was not

released from prison, however, until April 5, 2004, which is not unusual. **Ex. H 21.** At

that time, Mr. Gibson's Parole Officer was Mr. Nelson. **Ex. H 21.**

The casenotes reviewed by Officer Wood indicated that on the date of his release

on parole, Parole Officer Nelson picked up the plaintiff and reviewed the conditions of

his parole with him. **Ex. H 22.** Both Mr. Nelson and the plaintiff signed the conditions

of parole. **Exs. H 22; B.** Mr. Gibson's parole conditions included special conditions,

restricting his contact with his co-defendant and restricting him from consuming

alcoholic beverages or being in an establishment that serves alcoholic beverages. **Exs. H**

**23; B.**

When he reviewed Mr. Gibson's file in or around May of 2004, Officer Wood

noted a fax communication dated October of 2002 from the Office of Adult Supervision,

a Mr. DiMartino, which included the following message:

> We oppose the release of Joseph Gibson to Parole. The violation speaks
> for itself. It includes the fact that he tested positive for cocaine twice
> while on parole in April of 2000. This subject was arrogant and
> completely uncooperative with his probation. If necessary, I am available
> for an appearance at his hearing.

**Exs. H 24; C Fax 10/2002**.

The file also indicated that in May of 2001, the plaintiff's Probation Officer applied for

an arrest warrant for the plaintiff stating that Mr. Gibson had violated his probation by

using cocaine and then refusing in-patient treatment for drug use. **Ex. H 25.**

At or near the time of the transfer of parole supervision from Wallingford to

Officer Wood in Meriden, Officer Wood learned that the plaintiff was employed at

Crosby Trucking as a driver. **Ex. H 26.** Officer Wood facilitated plaintiff's drug

treatment at the Alternative Incarceration Center (hereinafter "AIC") in Meriden and

gave him a reporting a schedule. **Ex. H 26.**

Within a couple months of his transfer to Officer Wood's supervision, in late July or early August of 2004, Officer Wood issued Mr. Gibson a "misconduct" for missing a required urine test and for the use of cocaine based on his own admission that he had used cocaine in violation of the law and his conditions of parole. **Exs. D Misconduct Report; H 27.** The sanctions for the misconduct consisted of increased reporting requirements as well as increased urine screens for Mr. Gibson. **Exs. D; H 28.** The Misconduct report that Officer Wood completed at the time stated, "The above captioned inmate misconducted himself/herself ….At this point, however, we do not feel that a warrant for violation of parole is warranted." **Exs. D; H 28.**

In October of 2004, the plaintiff's status changed from being someone released on parole from his regular sentence to a court ordered period of special parole. **Exs. F Conditions of Parole 10/1/2004; H 29.** At this point in time, due to the plaintiff's change in status, Officer Wood reviewed a different, completed Conditions of Parole form with the plaintiff, and both of them signed the form. **Exs. F; H 29.** The Conditions of Parole at this time were the same as they were the previous time, and indicated that the plaintiff was to report as required and to refrain from using illegal drugs. **Exs. F; H 29.**

As far as Officer Wood recalls, until March 25, 2005, Mr. Gibson never indicated to Officer Wood that he felt unsafe reporting to the Meriden AIC office or to Officer Wood as his parole officer in Meriden, and he never once indicated that he felt generally unsafe in Connecticut. **Ex. H 30.** This difference between the testimony of the plaintiff and the defendant, however, is not material in the sense that it precludes summary judgment in this matter, as there is no clearly established duty for the defendant to

research or verify the excuse of a parolee that he cannot report as he feels his life is in danger.

After the misconduct report, Mr. Gibson successfully fulfilled his parole requirements until approximately February of 2005 when he called and indicated that he could not report as required because he had been involved in a motor vehicle accident. **Exs. H 31; J Field Note 2/17/05.** Mr. Gibson was directed to provide verification of this incident. **Exs. H 31; J.** A review of the casenotes indicates that Mr. Gibson never did provide verification of this incident to me or anyone affiliated with his parole supervision. **Ex. H 32.**

On March 24, 2005, the next month, Officer Wood had a case conference regarding Mr. Gibson with the AIC case manager Vanessa Fitzner-Brone, who indicated that the plaintiff had not been reporting to AIC as required. **Exs. H 33; G Field Note 3/24/2005.** The plaintiff had not reported since prior to his call regarding the unverified motor vehicle accident. **Ex. H 33.**

Officer Wood's documented plan of action at this time was to investigate. **Exs. H 34; G.** He placed a call to Mr. Gibson's residence and spoke with his father, leaving a message to have Mr. Gibson call him. **Exs. H 34; G.** The next day, March 25, 2005, Mr. Gibson called Officer Wood. **Exs. H 35; I Field Note 3/25/05.** Officer Wood told Mr. Gibson that Officer Wood had not seen him and he had not been complying with the conditions of his parole. **Exs. H 35; I.** The plaintiff indicated that had been going to Court in Bridgeport on a trial he thought everyone was aware of. **Exs. H 35; I.**

Officer Wood had not heard anything about the trial before Mr. Gibson told him this. **Ex. H 36.** Officer Wood had not see anything on television, read anything in the

paper or learned anything from any other media. **Ex. H 36.** Officer Wood told Mr. Gibson that even if he was involved in a Court proceeding, he was not relieved of his reporting obligations or his required substance abuse treatment. **Exs. H 37; I.**

Mr. Gibson admittedly told Officer Wood that he had received a single death threat via telephone and Gibson attributed it to his trial in Bridgeport. **Ex. H 38.** Officer Wood asked if Gibson knew who threatened him and he responded in the negative. **Ex. H 38.** Officer Wood told the plaintiff to call the police. **Ex. H 38.** At that point in time, Officer Wood was certain that Mr. Gibson had returned to using drugs and was doing whatever he could to avoid reporting to Officer Wood and having a drug test. **Ex. H 39.**

In his casenote regarding this call, Officer Wood stated simply "TC [telephone call] from subject—states he has been going to Court and thought that everyone was aware that he was occupied in that procedure Subject informed that he needs to be compliant with substance abuse treatment and reporting to parole Instructed to report 3/3/1/2005." **Ex. I.**

Officer Wood did not believe that Gibson had received a death threat, but Officer Wood did tell the plaintiff that if his life had been threatened, he should report it to the police. **Ex. H 40.** It is Officer Wood's experience that drug users on parole who have suffered a relapse will often resort to fabrication in order to avoid detection. **Ex. H 41.** Other than his general obligation to assist Mr. Gibson with his reintegration into society, Officer Wood has public safety obligations to violate parolees who were not complying with the conditions of their probation. **Ex. H 42.**

Wood also had concerns about Mr. Gibson using drugs given that his stated job was driving a truck for a moving company. **Ex. H 43.** During his phone conversation

with Mr. Gibson on March 25, 2005, Officer Wood instructed Mr. Gibson to report to him on March 31, 2005. **Ex. H 44.** This conversation with Mr. Gibson was on Good Friday, which was not a work day for Officer Wood. **Ex. H 45.** Officer Wood had this conversation with Mr. Gibson from his home. **Ex. H 45.** He recalls being direct and authoritative, but not unprofessional. **Ex. H 45.**

Officer Wood does recall a conversation on that day or within the next week with Mr. Gibson's attorney. **Ex. H 46.** The attorney stated that his client had indicated to him that he was fearful about reporting to Officer Wood due to the publicity surrounding the lawsuit. **Ex. H 46.** The attorney asked if Officer Wood had seen any of the publicity, and Officer Wood responded "no". **Ex. H 47.** Officer Wood also told the attorney that Mr. Gibson had not called him at any point and told Officer Wood that he would be involved in this lawsuit; he just assumed that Officer Wood knew. **Ex. H 47.**

The only thing Officer Wood recalls telling the attorney was that he could provide Mr. Gibson with Protective Custody in a prison setting, but that was the only way Officer Wood could do anything with regard to Mr. Gibson's safety. **Ex. H 48.** Officer Wood told the attorney if Mr. Gibson had concerns about his safety he should notify the police. **Ex. H 49.** Officer Wood told the attorney that Mr. Gibson was on escape status as a parolee at the present time, and that he needed to report as required. **Ex. H 50.**

Officer Wood told the attorney that he suspected that his client was using drugs again and he needed to get tested. **Ex. H 51.** Officer Wood does not recall the attorney's response. **Ex. H 51.** The conversation with the attorney was amicable and respectful. **Ex. H 52.** Officer Wood does recall telling the attorney that if he felt that the conditions

of Mr. Gibson's parole should be modified, he should contact the Board of Parole directly.  **Ex. H 53.**

Mr. Gibson did not report to Officer Wood on March 31, 2005.  **Ex. H 54.** Officer Wood did receive a call from a law enforcement officer stating that the plaintiff claimed to have been stabbed.  **Ex. H 54.**

Other than Mr. Gibson's stated concerns as expressed by him and through his attorney, which Officer Wood did not credit, Officer Wood had no reason to believe that Mr. Gibson's safety was more at risk than any other parolee.  **Ex. H 55.**  Officer Wood did not undertake to verify Mr. Gibson's claim of a singular, telephonic death threat, nor could he. **Ex. H 56.**

Officer Wood was in no way responsible for any injury to the plaintiff at any time.  **Ex. H 57.**  Obviously, Officer Wood did not set the plaintiff up for an assault by the Latin Kings or anyone else.  **Ex. H 57.**  Officer Wood certainly did not undertake any criminal behavior with regard to the plaintiff.  **Ex. H 57.**  All of his dealings with the plaintiff were professional and in good faith.  **Ex. H 58.**

Officer Wood continued to supervise Mr. Gibson's parole for a short time after the incident.  **Ex. H 59.**  On April 13 of 2005, Mr. Gibson reported to Officer Wood and indicated that he had been using cocaine.  **Exs. H 60.**  Officer Wood procured an appointment for him on April 18, 2007 at a substance abuse treatment center and instructed him to attend the appointment.  **Ex. H 60.**  Officer Wood's casenote for this date, April 13, 2005, two weeks after the incident, states:

> Subject reported as directed   Stated that he had not been reporting due to his being involved with a civil court case and that he felt that this officer should have been aware of that matter.  Subject informed that he did not mention his court case to this officer nor would that be a reason to not

18

adhere to parole commitment of substance abuse screening at Meriden
AIC an scheduled office visits w/ P/O [parole officer].
Subject informed that he will be issued misconduct report for not
reporting.  In addition, subject admitted that he had been using cocaine
when this officer requested a urine sample.  Subject directed to contact
Rushford Program and report on his progress in this matter on 4/18/2005.
**Ex. K 4/13/2005 field note.**

The following day, Officer Wood received a report from the New Haven police

that Mr. Gibson was stopped in the area where various narcotic substances can be bought

and sold on a frequent basis and was arrested by narcotic enforcement officers for

criminal trespass.  **Ex. H 61.**  When the Officers stopped Mr. Gibson's car, he told the

officers that he was there to purchase cocaine, but that the residents would not sell to Mr.

Gibson as they thought he was an undercover law enforcement officer.  **Ex. H 62.**  The

narcotics enforcement officers placed Mr. Gibson under arrest.  **Ex. H 63.**  Officer Wood

was notified the following day and he faxed to the police a remand to custody order.  **Ex.**

**H 64.**  The Board of Parole decided to violate Mr. Gibson's parole, and he was re-

incarcerated.  **Ex. H 64.**

Officer Wood did not supervise Mr. Gibson's parole after that time.  **Ex. H 65.**

Officer Wood had no reason to harm Mr. Gibson at any time.  **Ex. H 66.**  He had no

personal vendetta against Mr. Gibson.  **Ex. H 66.**  Officer Wood has naturally never

assisted members of the Latin Kings gang conduct any illegal activity.  **Ex. H 67.**

**III.**     **Argument**

**A.**     **Applicable Standard**

In a summary judgment motion, the burden is on the moving party to establish hat

there are no genuine issues of material fact in dispute and that it is entitled to judgment as

a matter of law.  See Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

256 (1986).  A Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Affidavits…show that there is no genuine issue as to any material fact." *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir. 1993).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate. *Clarke v. Sweeney,* 312 F. Supp.2d 277, 281 (D. Conn. 2004), quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

"[W]here the versions of fact differ, [the Court] must consider [the non-moving party's] version and make all possible inferences in h[is] favor." *Cowan ex rel. Estate of Cooper v. Breen,* 352 F.3d 756, 760 (2d Cir. 2003).  "Nevertheless, the nonmoving party must come forward with specific fats showing that there is a genuine issue of material fact for trial….Conclusory allegations, conjecture, and speculation … are insufficient to create a genuine issue of fact." *Shannon v. New York City Transit Authority,* 332 F.3d 95, 99 (2d Cir 2003) (citations and internal quotation marks omitted).

### B.     No Substantive Due Process Claim

The plaintiff's first claim is that Officer Wood deprived him of substantive due process of law in violation of the Fourteenth Amendment as enforced through 42 U.S.C. §§ 1983 and 1988.  This claim fails as a matter of law even crediting the plaintiff's claims regarding the telephone calls received by Officer Wood from plaintiff and his attorney and the assault he says followed, and in the complete absence of any other evidence to support the insidious speculation that Officer Wood somehow was involved in an assault on plaintiff.

"In order to violate an individual's substantive due process rights, a governmental actor must engage in activity that 'shocks the conscience.'" *Demas v. Town of Trumbull,* 2005 U.S. Dist. LEXIS 5350 (D. Conn. March 31, 2005), quoting *Rochin v. California,* 342 U.S. 165, 172 (1952). "For state action to be taken in violation of the requirement of substantive due process, [it] must have occurred under circumstances warranting the labels 'arbitrary' and "outrageous'" *Natale v. Town of Ridgefield,* 170 F.3d 258, 262 (2d Cir. 1999). "Substantive due process 'does not forbid governmental action that might fairly be deemed arbitrary or capricious." *Demas,* supra at *17, citing *Natale,* 170 F.3d at 262-63. "Only the most egregious official conduct in which government officials abuse their power and employ it as an instrument of oppression can be said to be arbitrary in the constitutional sense." *Demas,* supra at *18, citing *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998). The Supreme Court has "been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 833, 834 (1998). Even conduct that is incorrect or ill-advised does not meet this high standard. *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir 1994).

In this case, taking the facts in the light most favorable to the plaintiff, Officer Wood's denial of plaintiff's request that he be excused from reporting to his parole officer due to publicity surrounding a trial as well as an alleged death threat Officer Wood did not credit simply does not rise to the level of outrageous. Aside from the hindsight plaintiff argues exists in the alleged assault on the plaintiff, no parole officer can be said to act outrageously when enforcing the conditions of parole. There is no duty on a parole officer to guarantee the safety of parolees reporting to him or her, nor is there

any duty that the parole officer investigate or verify a parolee's claim that the neighborhood is too dangerous for the parolee to comply with his reporting requirements. Nor is there any duty on a parole officer to meet a parolee outside of his assigned office and receive the parolee's urine for drug testing at another spot. Indeed, if Officer Wood had agreed to meet the plaintiff at another location, private or public, and harm had come to the plaintiff in that other location, the plaintiff could allege involvement in an assault or even negligent failure to sufficiently screen the alternate location.

The plaintiff was in the public realm, discharged from the custody of the Department of Correction, and therefore responsible for his own safety. The plaintiff did not call the police or go into hiding. He cannot hold the defendant parole officer liable for any crime committed by unknown third parties under these circumstances. The facts simply do not allow a reasonable jury to conclude that the defendant violated the plaintiff's substantive due process rights.

"Substantive due process protects an individual from governmental violations of personal rights that are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental or are implicit in the concept of ordered liberty." *Demas,* supra, at * 16, quoting *Rochin,* supra. Even assuming arguendo that the defendant in this case somehow contributed to the plaintiff's harm by failing to appreciate the risk at hand, "[T]he United States Supreme Court has made clear [that] the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Demas,* supra at * 16, citing *Lewis,* supra, 523 U.S at 848.

A Connecticut case in which two witnesses to a murder were killed by a relative of the murder suspect and the plaintiff estate unsuccessfully sought to hold government

officials liable is instructive. *Clarke v. Sweeney, supra,* 312 F. Supp.2d 277. In that case, city officials had undertaken some steps to protect the child witness and his mother, also a witness, by sometimes posting police outside their residence for a short period and then failing to act on subsequent requests that they do so when the witnesses had been placed on a witness list to testify against the accused murderer, who was known to be violent ant to subject proposed witnesses to violence. *Id.* at 281-187.

In granting summary judgment for the defendants, Judge Kravitz considered the Supreme Court's decision *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189 (1989). In that case, in which an abused child was not taken from his father's custody despite various calls to Social Services and was ultimately killed by the facility, the Supreme Court reasoned:

> Nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of live, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means…..If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

*Id.* at 195.

As the court noted in *Clarke*, certain exceptions to this general rule have been made, but, like *Clarke,* the facts of this case are insufficient to bring it into those exceptions. 312 F.3d at 292. First, the State-created danger exception set forth in the Third Circuit does not apply. The four elements of such an exception are as follows:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the State actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the State and the plaintiff; and (4)

the State actors used their authority to create an opportunity that otherwise
would not have existed for the third party's crime to occur.
*Id.*, citing *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.), *cert. denied*, 516

U.S. 858 (1995).

In this case, the harm ultimately caused was not foreseeable to the defendant, who

had only the word of the plaintiff and his attorney to go on and perceived no true threat to

the plaintiff.  Officer Wood had no reason to credit plaintiff's claims; nor was he required

to verify them.  Thus, his behavior does not meet the second element, that is, the

defendant did not act in willful disregard for the safety of the plaintiff.        While a

relationship concededly existed between the two men, any claim to this exception

likewise fails under the fourth prong.  Officer Wood did not cause any "opportunity" by

simply adhering to the requirements of plaintiff's parole.  He did not force or compel the

plaintiff to become an informant, to go to trial, or to create media attention to that status.

Wood did not place the plaintiff in harm's way.

Nor does the "special relationship" exception explored in *Clarke* apply.  312 F.2d

at 294-97.  Just as issuing a subpoena or compelling attendance in court could not lead to

liability were a person to be injured en route to that appointment, requiring a parolee to

attend a parole meeting does not rise to the level of a special relationship obliging the

parole officer to ensure the parolee's safety en route to the meeting.

One Court considering a claim by a parolee held that "when a non-custodial

person" such as a parolee "brings an Eighth Amendment claim, the higher standard

'shocks the conscience' is used, rather than the less burdensome 'deliberate

indifference.'"  *Luna v. Weiner,* 2006 U.S. Dist. LEXIS 37695, *10 (D.N.J. 2006), citing

*Koulta v. City of Centerline,* 2006 U.S. Dist. LEXIS 41101, 2006 WL 1000770, *5

(E.D.Mich. 2006) (claim of deliberate indifference to medical needs by a parolee).  The Court reasoned:

> It is not disputed that Luna was not in physical custody at the time of his claims.  As a parolee, he had the freedom to "exercise normal responsibility for his own welfare," and could have secured any medical attention of his choosing….Once the plaintiff walked beyond the walls of the prison in which he was being held, he regained his ability to care for himself…

*Id.*

Indeed, even were the plaintiff able to bring this claim of failure to protect under the Eighth Amendment standard applicable in a correctional facility in which officials control every element of an inmate's life, this claim would fail under the standard set forth in *Farmer v. Brennan,* 511 U.S. 825, 832 (1994), quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).  The plaintiff did not provide sufficiently specific information for Officer Wood to act on.  Simply claiming that the Meriden parole office was in a neighborhood frequented by criminals, Hispanics or even Latin Kings members and that he has received death threats too insignificant to report to the police is insufficient to establish that his parole officer had a duty to change his reporting requirements or acted in willful disregard for his safety.  If that was all a parolee need do to avoid his reporting requirements, without anything other than his own word, the job of a parole officer would become exponentially more difficult, and the supervision of parolees diminished.

Even under the Eighth Amendment, in order to establish deliberate indifference to the needs of an inmate, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*"  *Farmer,* 511 U.S. at 837 (emphasis added).  "Mere negligent failure to protect cannot provide the basis for § 1983 liability."  *Johnson v. Abate,* 2000 U.S. Dist.

LEXIS 19047, *8 (E.D.N.Y. Dec. 22, 2000), citing *Farmer*, supra; *Daniels v. Williams*, 474 U.S. 327, 333-34 (1986); *Stubbs v. Dudley*, 849 F.2d 83 (2d Cir. 1988), *cert. denied*, 489 U.S. 1034 (1989).

### C.     Qualified Immunity on Substantive Due Process Claim

Even if the Court determines that the plaintiff's claim that Officer Wood violated the plaintiff's right to substantive due process by requiring him to comply with his parole condition and report on a date certain despite the plaintiff's stated claims of risk, Officer Wood is entitled to qualified immunity on this claim.

> Qualified immunity shields government officials from liability for civil damages as a result of their performance of their discretionary functions, and serves to protect government officials from the burdens of costly but insubstantial lawsuits. Government actors performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act. The objective reasonableness test is met~and the defendant is entitled to qualified immunity~if officers of reasonable competence could disagree on the legality of the defendant's actions.

*Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir. 1995). Because the qualified immunity entitlement is an "immunity from suit rather than a mere defense to liability … [it] is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). The "qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991).

In this case, there was certainly no clearly established duty for Officer Wood to relieve the plaintiff of his reporting requirements based on the information he presented it

26

and taken in light of the fact that the plaintiff presented with limited credibility as to his

drug use and had failed to report for nearly two months previous, citing an unverified car

accident as well as his participation in a civil trial as reasons not to receive a drug test or

report to his perspicacious parole officer.  Most definitely, reasonable parole officers

could disagree as to whether any such duty was established, with those officers such as

Officer Wood having the more reasoned opinion.

### D.     No Procedural Due Process Right Violated

Were the plaintiff able to state a cognizable procedural due process right that he

claims the defendant violated, his substantive due process claim would fail for that reason

alone.  The Second Circuit has made clear that "where a specific constitutional provision

prohibits government action, plaintiffs seeking redress for that prohibited conduct in a §

1983 suit cannot make reference to the broad notion of substantive due process."  *Velez v.

Levy,* 401 F.3d 75, 94 (2d Cir. 2005).  "Where another provision of the Constitution

provides an explicit textual source of constitutional protection, a Court must assess a

plaintiff's claims under that explicit provision and not the more generalized notion of

substantive due process."  *Kia P. v. McIntyre,* 235 F.3d 749, 757-58 (2d Cir. 2000),

quoting *Conn v. Gabbert,* 526 U.S. 286, 293 (1999).

Clearly, then, if the plaintiff had any sort of procedural due process claim, his first

claim, that of substantive due process, would be moot.  There is simply no procedural due

process claim that can be brought, however, given the facts of this case.  As much as the

plaintiff's stretches the law to cast his claim as one for substantive due process absent any

true source of constitutional protection, it would be an even greater stretch to find a

sufficient claim for procedural due process.

To state a claim for violation of procedural due process, Johnson must first show that he had a protected li, Johnson must first show that he had a protected li and, if he had such an interest, that he was deprived of that interest without being afforded due process of law. *See Tellier v. Fields,* 230 F.3d 502, 511 (2d Cir. 2000) (citations omitted). Procedural due process claims are different in kind from this inadequate failure to protect claim, and is not possible to apply this part of the Constitution to the facts of this case. The plaintiff's liberty in this case was already restricted by his criminal conviction and the sentence that resulted. His alleged assault was not caused by the defendant directly, so he did not deprive the plaintiff of any interest. In the absence of any liberty or property interest, no process was due. The state has not created any right in the plaintiff to be free from the criminal act of a third party or parties, and thus, there is simply no procedural due process claim here.

### E.      Qualified Immunity as to Procedural Due Process Claim

Since the basis for any procedural due process claim is impossible to even conceive, the defendant Officer Wood is clearly entitled to qualified immunity on this claim.

### F.      No Fourth Amendment Right Enunciated/Qualified Immunity

"A Fourth Amendment violation necessitates a "seizure" by a government authority." *Scatorchia v. County of Suffolk,* 2006 U.S. Dist. LEXIS 5617 (E.D.N.Y. Jan. 24, 2006). "The Fourth Amendment is not the proper source of [a] constitutional right [if the defendant's] objectionable conduct occurred  outside of a criminal investigation or other form of government investigation or activity." *Poe v. Leonard,* 282 F.3d 123, 136 (2d Cir. 2002) (Fourth Amendment did not apply to claim in which state trooper

surreptitiously videotaped female in state of undress).    No seizure of the plaintiff by virtue of an arrest or a search is alleged in this case, and thus there is no cognizable Fourth Amendment claim.  In the absence of any articulable claim, qualified immunity obviously applies here as well.


DEFENDANT

JAMES WOOD
RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:____/s/ Lynn D. Wittenbrink_____
     Lynn D. Wittenbrink
     Assistant Attorney General
     Fed. Bar No. ct08575
     110 Sherman Street
     Hartford, CT  06105
     Telephone No.:  (860) 808-5450
     Fax No. (860) 808-5591
     lynn.wittenbrink@po.state.ct.us

## <u>CERTIFICATION</u>

I hereby certify that on this 5th day of November, 2007, a copy hereof was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


_____/s/ Lynn D. Wittenbrink_____
Lynn D. Wittenbrink
Commissioner of the Superior Court