UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH GIBSON, III | : | CIVIL ACTION NO. |
| | : | 3-06-CV-1265 (JCH) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| JAMES WOOD, | : | MAY 28, 2008 |
| | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 53)**

Plaintiff, Joseph Gibson, III, brings this action claiming violation of his rights under the Fourteenth and Fourth Amendments to the United States Constitution pursuant to 42 U.S.C. sections 1983 and 1988. See Complaint at 4 (Doc. No. 1). Gibson's claims arise from injuries he sustained when he was allegedly attacked by members of the Latin Kings gang when reporting to his parole officer, Defendant James Wood. Wood moves the court to enter summary judgment on all of Gibson's claims.

**I.      FACTS[1]**

Gibson was incarcerated from 1991 through December 15, 1999. During his incarceration, he claims that he was coerced by corrections officials to infiltrate the Latin Kings gang and then act as a confidential informant for those officials. On September 15, 1999, Gibson was assaulted in the prison. He believes that he was assaulted by "hit men" for the Latin Kings. He asserts that ever since that time the Latin

---

[1]The facts are those admitted by the parties in their Statements of Facts pursuant to Local Rule 56(a) unless otherwise noted.

1

Kings have had a "hit out on his life." Depo. of Gibson ("Gibson Depo.") at 47, Ex. A to Def.'s 56(a)(1) Stat., Att. 3 (Doc. No. 53). Gibson brought a lawsuit against two correctional officers regarding this claim. A trial was held on March 21, 2005. The case ended in a mistrial. Gibson's claim to have been an infiltrator and informant against the Latin Kings was publicized by the news media in Connecticut and elsewhere at the time of the trial.

Gibson was re-incarcerated in October of 2001, and released in April 2004. Starting on May 6, 2004, Gibson's parole was supervised by Wood in Meriden, Connecticut. Wood is a Parole Officer for the State of Connecticut, a position he has held for the last eighteen years. Gibson reported to Wood weekly or bi-weekly, and was subject to random uranalysis. Gibson admits that he was "on and off cocaine" while he was released between 1999 and 2001.

In December 2004, Gibson asserts that he told a female staff member at the parole office in Meriden that he was concerned for his safety, but Wood was not present at that time. Later that month, or in January of 2005, Gibson claims that he "mention[ed]" the name of a man to Wood who he believed was a member of the Latin Kings and whom Gibson had seen at the Meriden Alternative Incarceration Center ("AIC"). According to Gibson, Wood looked up that individual's information and told Gibson not to "worry about him" because he was "discharging pretty soon." Wood Depo. at 78.

On March 24, 2005, Gibson failed to report to Wood as scheduled and did not call to explain why. Wood called Gibson's residence that night and told his father to have Gibson call him. Gibson has testified that he did not "have to" report that day

2

because he had communicated to his case manager, not Wood, at the Parole Office that he was busy with a lawsuit he was prosecuting, and she told him not to "worry about it". Gibson Depo. at 109. Gibson and Wood spoke on March 25, 2005, at which point Gibson claims that Wood told him, "She's not your parole officer; I am." Id. at 108. During that call, Gibson told Wood that he had missed his reporting appointment because he was in a trial and he thought everyone was aware of it.[2] See Affidavit of Wood ("Wood Aff.") at ¶ 35, Ex. H to Pl.'s 56(a)(1) Stat. Wood had heard nothing of Gibson's trial in the media. He told Gibson that, even if he was involved in a court proceeding, he was not relieved of his reporting obligations or his required substance abuse treatment. Gibson told Wood that he had received a death threat over the phone

---

[2] In his Rule 56(a)(2) Statement, Wood denies this statement by writing, "Plaintiff denies that such statements were part of the conversation between the Plaintiff and the Defendant on March 25, 2005. Plaintiff detailed the contents of said conversation in his deposition, a copy of which is attached as Defendant's Exhibit A, and said statements are not contained therein." Pl.'s 56(a)(2) Stat. at ¶ 106. Wood makes identical "denials" to paragraphs 105, 108, 110, 111, and 142. See id. Wood similarly denies paragraphs 134, 135, 136, 137, 146, 147 and 148 with the statement, "Deny. The Plaintiff has made the allegation that the Defendant may very will have organized, orchestrated or at the very least allowed the attack to occur." See also Wood's 56(a)(2) Stat. at ¶ 133 for a denial which is substantively identical, though worded differently.

Local Rule of Civil Procedure 56(a)(2) requires that "the papers opposing a motion for summary judgment shall include a document entitled 'Local Rule 56(a)(2) Statement,' which states in separately numbered paragraphs . . . whether each of the facts asserted by the moving party is admitted or denied." LOC. R. CIV. P. 56(a)(2). Local Rule 56(a)(3) provides that,

> Counsel and pro se parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the evidence admitted in accordance with Rule 56(a)(1) or in the Court imposing sanctions, including . . . when the opponent fails to comply, an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law.

LOC. R. CIV. P. 56(a)(3). Given that plaintiff has failed to provide "specific citations" to support many of the factual assertions in his Rule 56(a)(2) Statement, any facts asserted by Wood in his Rule 56(a)(1) Statement that are supported by evidence, and the denial of which is not supported by citations to evidence in the record in Gibson's Rule 56(a)(2) Statement, will be deemed admitted by the court.

3

that he believed was related to his trial, but that he did not know who had threatened him. Wood claims that he actually informed Gibson that he had received two death threats. See Wood depo. at 84. Gibson told Wood to call the police if he had been threatened. At that time, Wood was "certain" that Gibson had returned to using drugs and was doing "whatever he could to avoid reporting to [him] and having a drug test." Wood. Aff. at ¶ 39. During this call, Wood instructed Gibson to report to him on March 31, 2005.

Sometime during the next week, Gibson's attorney called Wood to inform him that Gibson was fearful about reporting to Wood due to the publicity surrounding his lawsuit. Wood told Gibson's attorney that Gibson had not told him at any point that Gibson would be involved in this lawsuit. Wood further told him that the only thing he could do with regards to Gibson's safety was to put him in Protective Custody in a prison setting, but that otherwise Gibson would need to call the police if he felt threatened. He also told Gibson's attorney that he believed Gibson was using drugs again and needed to be tested.

On March 31, 2005, Gibson did not report as directed to Wood. Wood received a call from law enforcement that Gibson claimed to have been stabbed. Gibson claims that on that day he drove to the Meriden AIC to report as required. See Gibson depo. at 123. As soon as he got out of his car, three masked individuals wearing hoods surrounded him. See id. at 123-5. He claims that one put a gun to his head and pulled the trigger, but the gun did not work due to a "back fire." Id. at 123. He claims a second man pulled a knife and stabbed him in the chest. See id. at 127. He claims the men then drove away and Gibson called 911 from his cell phone. Id. at 128. The

police arrived, and he was put into an ambulance and driven to Yale New Haven Hospital where he was treated and released after five or six days. See id. at 137-141.

When asked in his deposition whether he thought that Wood had arranged for members of the Latin Kings to assault him outside of the Meriden AIC, Gibson testified

> I don't know. I don't know. I don't think so. I don't know if somebody in the Department of Corrections did. I don't know. You know, I'm dealing – like I said before, I don't know. Deefendorfer, the gang intelligence officer, we just had sued him. I seen [sic] him lie on the witness stand. What else are they capable of? The warden lied on the witness stand. You know, what are they capable of? I don't know if it was them. Mr. Woods works for the Department of Correction. I don't know. I have no proof of it, let's put it that way.

Gibson Depo. at 130. At another point in his deposition, when asked if "Mr. Wood somehow communicated to representatives of the Latin Kings gang that you were going to be coming," Gibson responded "Well, to be honest with you, it's not my contention." Gibson Depo. at 96-7. He stated that, "the Meriden detectives themselves and [his] attorney" suggested to him that he might have been set up, based on the fact that Wood was "the only one who knew that [Gibson] [was] coming that night other than [his] family and [his] attorneys." Id. at 97. When asked if he had anything to support such an allegation, Gibson responded that he had questioned Wood's integrity when he "told Mr. Wood one time that I knew of a Hispanic male who was selling cocaine. And Mr. Wood neglected to actually even pursue it, or even acknowledge it." Id. at 98.

On April 13, 2005, Gibson reported to Wood and told him that he had been using cocaine. Wood made him an appointment at a substance abuse treatment center for April 18, 2005, and told him to attend the appointment. The next day, Gibson was arrested by New Haven narcotic enforcement officers for criminal trespass in an area

5

where narcotics are frequently bought and sold. Gibson told the officers that he was there to purchase cocaine, but that the residents of the area would not sell it to him because they thought he was an undercover law enforcement agent. Based on this arrest, the Board of Parole violated Gibson's parole, and he was re-incarcerated. Wood did not supervise Gibson after this time.

## II. STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III. DISCUSSION

### A. Due Process Claim

The due process clause of the Fourteenth Amendment provides that, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AM. XIV. Gibson claims that, by "intentionally or recklessly [causing] members of the Latin Kings gang to learn that the plaintiff would be available at his office to be killed on the evening of March 31, 2005," Wood deprived him of his right to substantive due process in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.[3] See Complaint at ¶ 18, 20.

In DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 195, (1989), the Supreme Court held that, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." The court elaborated that,

> [t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

Id.

The Second Circuit has identified two exceptions to the general rule of DeShaney. See Matican v. City of New York, __ F.3d __, 2008 WL 1808251 at *3 (2d

---

[3] Gibson also alleged that Wood violated his right to procedural due process. See Complaint at ¶ 20. However, Gibson does not defend this claim from Wood's Motion for Summary Judgment. See Pl.'s Mem. in Opp. Therefore, Gibson has abandoned his claim of violation of his right to procedural due process and Wood's Motion for Summary Judgment is granted as to that claim.

Cir. 2008). "First, the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a 'special relationship' with the victim." Id. (citing Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993)). "Second, the state may owe such an obligation if its agents in some way assisted in creating or increasing the danger to the victim." Id. (quoting Dwares v. City of New York, 985 F.2d 94, 98-99 (2d Cir. 1993) (internal quotation marks omitted)). The distinction between these two categories of cases "suggests that 'special relationship' liability arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and the private assailant." Pena v. DePrisco, 432 F.3d 98, 109 (2d Cir. 2005).

It is unclear under which theory of liability Gibson believes Wood's actions lie. Therefore, the court will consider both doctrines, starting with the exception for a state created danger. See Pl.'s Mem. in Opp. at 10. Gibson alleges that Wood "intentionally . . . caused members of the Latin Kings gang to learn that the plaintiff would be available at his office to be killed on the evening of March 31, 2005." Complaint at 4. Therefore, Gibson alleges that Wood had a relationship with the Latin Kings such that he would be liable under a "state created danger" theory based on his relationship to the Latin Kings. However, Gibson offers no evidence from which a reasonable jury could conclude that Wood had any relationship with the Latin Kings, much less that he contacted them to inform them of Wood's appointment. The only evidence Gibson points to that could arguably support such a conclusion is his deposition testimony in which he states that the "Meriden detectives" and "his attorneys" suggested to him that he had been set up, see Gibson depo. at 97, that Wood was the only one other than his

8

family who knew he had an appointment that night, see id., that he reported to Wood that another parolee was selling drugs, which Wood ignored see id. at 99, that the Latin Kings had infiltrated the Department of Parole, see id. at 97, and that he has seen "numerous acts of perjury" on behalf of the Department of Parole, see id. at 98. In contrast to this speculative testimony, Gibson flatly denied that it was his contention that Wood had set him up, see Gibson depo. at 97, and additionally said, "I mean, I don't know. Maybe I was set up. Maybe I wasn't. I don't know. It could be. It's a possibility. I don't know," id. at 98. No reasonable jury could conclude based on Gibson's inconsistent and unsupported speculations that Wood had any relationship with the Latin Kings. Therefore, Gibson's theory for Wood's liability may not rest on the "state created danger" exception to the DeShaney rule.

The other exception to the DeShaney rule provides a better fit. The "special relationship" exception "grows from the DeShaney Court's observation that 'in certain circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Matican, 2008 WL 1808251 at *4 (quoting DeShaney, 489 U.S. at 198). The Second Circuit has held that, "a parolee, although not in the state's physical custody, is nonetheless in its legal custody, and his or her freedom of movement, while not as restricted as that of an incarcerated prisoner, is nonetheless somewhat curtailed." Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005). "Accordingly, because the limitations imposed by the state are minimal, so too are the duties it assumes." Id.

Under Jacobs, Gibson and Wood clearly had the kind of "special relationship" which would subject Wood to liability notwithstanding the general rule of DeShaney.

9

Therefore, Wood could be liable for Gibson's injuries if his requirement that Gibson report to see him despite Gibson's concerns for his safety "shock the conscience." See Lombardi v. Whitman, 485 F.3d 73, 81 (2d Cir. 2007).  To "shock the conscience," official conduct must be "outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity."  Id. at 82 (internal quotation and citation omitted).  Courts are cautioned to be "reluctant to expand the concept of substantive due process because the guideposts for responsible decision making in this unchartered area are scarce and open-ended."  Id. (internal quotation and citation omitted).  "In gauging the shock, negligently inflicted harm is categorically beneath the threshold, while conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Id. (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)) (internal quotation marks omitted).  In between these two extremes lies deliberate indifference, which requires an "exact analysis of the circumstances" because "[deliberate indifference that shocks in one environment may not be so patently egregious in another."  Id. (quoting Sacramento, 523 U.S. at 850) (internal quotation marks omitted).

In support of his claim that Wood's behavior shocks the conscience, Gibson argues that he had expressed his concerns about his safety to Wood and had informed him of the death threats he had received.  See Pl.'s Mem. in Opp. at 8-10.  There are several other facts regarding the circumstances of Gibson's claim relevant to this analysis.  First, in the circumstances of this case, Wood had reason to believe, based on his own experience and the fact that Gibson had missed his last appointment without calling, that Gibson was fabricating his safety concerns because he had

returned to drug use and wanted to avoid undergoing a drug test. See Wood's Affidavit at ¶¶ 2, 35 -38, and 39. Second, Wood told Gibson to call the police if he was concerned, id. at ¶ 38, but Gibson never called. See Gibson Depo. at 94. Third, Gibson points to nothing in the record to indicate why Gibson was in any more danger reporting to the Meriden AIC than he was anywhere else in Connecticut. According to his testimony, the Latin Kings called him at his father's house to threaten his life, so they clearly knew where he lived; Gibson offers no explanation of why the Latin Kings would be more likely to attack him at the Meriden AIC than anywhere else. Based on this record, no reasonable jury could conclude that Wood's requiring Gibson to report to him at the Meriden AIC "shocks the conscience."

Where a government official creates a danger based on decision making that serves no "important governmental responsibility," he may be liable for violating the Fourteenth Amendment. Lombardi v. Whitman, 485 F.3d 73, 82 (2d Cir. 2007) (citing Pena, 432 F.3d at 114). However, in Lombardi, the Second Circuit found that a government official could not be held liable for making an incorrect decision when facing the "pull of competing obligations." Id. Such is clearly the case here. Wood faced the competing interests of Gibson's claimed threat to his safety and the public's interest in Gibson's compliance with the conditions of his release. In this context, no reasonable jury could conclude that Wood's choice to discount Gibson's concerns and require him to report to the Meriden AIC shocks the conscience such as to deprive Gibson of his Fourteenth Amendment rights.

B.    Fourth Amendment Claim

Gibson alleges that Wood "[e]ngaged in an unreasonable seizure of the plaintiff's

person in violation . . . of the Fourth Amendment to the United States Constitution . . . ." Complaint at ¶ 20. Wood argues that Gibson's claim is not cognizable under the Fourth Amendment because the assault on Gibson occurred outside of any governmental activity. See Def.'s Mem. in Supp. of Mot. for Summ. Judg. at 28. The court agrees.

The Second Circuit has held that, "[t]he Fourth Amendment is not the proper source of [plaintiff's] constitutional right because [defendant's] objectionable conduct occurred outside of a criminal investigation or other form of governmental investigation or activity." Poe v. Leonard, 282 F.3d 123, 136 (2d Cir. 2002). Gibson argues that, "[i]t could certainly be argued that when the State required the Plaintiff to report to the Defendant and submit to drug testing and employment requirements as conditions of his parole, that the objectionable conduct occurred within, during or pursuant to a governmental activity." Pl.'s Mem. at 12. Even drawing all inferences favorable to Gibson, no reasonable trier of fact could conclude that an assault on a public street at which no government official was present or participating was "within, during or pursuant to a governmental activity." The holding of Poe clearly precludes Gibson's claim under the Fourth Amendment. Therefore, Wood's Motion for Summary Judgment as to that claim is granted.

### IV. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment (Doc. No. 53) is GRANTED. The clerk is directed to close the case.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 28th day of May, 2008.

                                       /s/ Janet C. Hall
                                       Janet C. Hall
                                       United States District Judge